CITY OF LONG BEACH, a municipal corporation, Sigurd A. Ougland and J. A. Jacobsen & Company, Inc., a corporation, Appellants,

v.

NATIONAL DEVELOPMENT COMPANY, a corporation, et al., Appellees.

No. 16930.

United States Court of Appeals
Ninth Circuit.
April 3, 1961.
Rehearing Denied June 2, 1961.

Ekdale & Shallenberger and Arch E. Ekdale and Gordon P. Shallenberger, San Pedro, Cal., Wahlfred Jacobson, City Atty. for City of Long Beach, Long Beach, Cal., John R. Nimocks, Deputy City Atty., San Pedro, Cal., for appellants.

Lillick, Geary, McHose, Roethke & Myers, William A. C. Roethke, and Kenneth E. Kulzick, Los Angeles, Cal., for appellee National Development Co.

McCutchen, Black, Harnagel & Shea, Philip K. Verleger and Howard J. Privett, Los Angeles, Cal., for appellee, co-libellants Aetna (Fire) Ins. Co.

Before BARNES, HAMLIN and MERRILL, Circuit Judges.

HAMLIN, Circuit Judge.

The National Development Company, appellee herein, is a Philippine corporation and the owner of the Philippine motorship Dona Aurora. It filed a libel in the United States District Court for the Southern District of California, Central Division, against the City of Long Beach, a municipal corporation, J. A. Jacobsen & Co., Inc., a corporation, and Sigurd A. Ougland, appellants herein, for damages sustained by the Dona Aurora by reason of her collision on August 29, 1955, with the outer breakwater at the entrance of

Long Beach Harbor, California. Subsequent to the filing of the libel, certain insurers of cargo were, by the order of the district court, admitted to prosecute the cause as co-libellants. Sigurd A. Ougland was a municipal port pilot for the City of Long Beach and was the agent and servant of J. A. Jacobsen & Co., Inc., and the City of Long Beach. At the time of the collision he was acting within the scope and course of his duties. Following a trial before the court, the district judge found that Ougland was careless and negligent in navigating the Dona Aurora; that through his negligence the ship collided with the breakwater; and that there was no fault on the part of the Dona Aurora or her agents, servants or employees which in any way caused or contributed to the collision. The judge thereafter rendered judgment in favor of the appellees. Appellants timely filed an appeal to this court from said judgment. Jurisdiction in the district court was based upon 46 U.S.C.A. § 740, 28 U.S.C.A. § 1333(1) and Const. Art. III, § 2. Jurisdiction in this court is based upon 28 U.S.C.A. § 1292(a) (3).

The entrance to Long Beach Harbor is a 1600-foot opening in a breakwater which runs generally in an east-west direction. There is a lighthouse on the eastern edge of the opening and another smaller lighthouse on the western edge of the opening. It is the unsuccessful attempt of the Dona Aurora to pass through this 1600-foot opening that is the subject of this appeal.

From the evidence and the findings of the district court certain salient facts are established. During the early morning of August 29, 1955, the master of the Dona Aurora, Captain Baura, requested the services of a pilot in order that he might enter Long Beach Harbor. When the ship arrived outside the harbor, shortly before 7 A.M., the pilot boat was not in view, so Captain Baura waited near the entrance buoy. At about 7 A. M. Captain Ougland, a Long Beach municipal port pilot, boarded the Long Beach pilot boat and started out to the

Dona Aurora. Between the pilot station and the breakwater entrance the pilot boat encountered fog, and in accordance with his previous standing orders, Captain Ougland arranged to have Captain Jacobsen summoned to the pilot station on shore so that the shore-based radar would be operating if it should be needed. Some time after seven o'clock the pilot boarded the Dona Aurora. On four prior occasions he had acted as pilot when the Dona Aurora entered Long Beach Harbor, and on nine prior occasions Captain Baura had been the master of the Dona Aurora when the ship entered Long Beach Harbor. The master testified to the meeting as follows:

"We greeted in the usual manner, and at that moment I asked him if we can safely enter the Long Beach Harbor. * * *

"So, he said, 'We can enter.' As usual he had been entering the ship in the same manner, when he came before, there was no different manner in which he came in, but this time he had slung on his shoulder a walkie-talkie, a Motorola walkie-talkie, and he told me * * * 'Yes, we can with this.' "

The district court found that the pilot assumed the conn of the ship, thereafter gave all course and engine orders and was in charge of the navigation and movement of the ship until it grounded on the Long Beach breakwater some fifteen minutes later.

When the pilot first came aboard, he was in contact with the radar station on shore by means of his walkie-talkie radio. However, shortly thereafter, for some unascertained reason, the walkie-talkie set became inoperative and remained so until after the ship struck the breakwater. The pilot testified that he tried repeatedly to make contact with the pilot station on shore but that he did not get any answer. The evidence conflicts as to whether the pilot gave this information to the master of the ship. The district court, however, found that this interrup-

tion was known to the appellants, but was not known to the master of the ship. The pilot testified that when he boarded the ship there was very limited visibility and that he did not give any instructions to the captain of the pilot boat to stand by. The pilot had experienced walkie-talkie transmission failures "two or three times" previously and had been informed by other Long Beach pilots that they had had trouble also. There was evidence that all of the Long Beach pilots had been instructed in the use of the radar equipment with reference to the problems that might be encountered. Certain operating instructions had been prepared, including Rule 12, which reads as follows:

"If there should be any interruption of communication with the station at any time during operations, the boat or vessel he is aboard is to be stopped until contact has been resumed."

Ougland did not act in accordance with this instruction.

When the pilot assumed the conn of the vessel he neither asked for nor received a fix on the vessel's position from the shore-based radar operator, the ship's radar, nor any other source. He did contact the shore-based radar station and obtain two bearings from the ship to the breakwater entrance, 320° to the lighthouse on the end of the breakwater on the west side of the entrance and 330° to the center of the entrance. At the time these bearings were obtained the ship had a heading of 40° true. At this time, however, the pilot had not seen the entrance buoy which is located exactly one mile due south from the middle of the entrance and had not obtained exact information as to the position of the ship. There was a conflict of testimony between the pilot and the helmsman as to

what course was followed. According to the pilot, he first gave a course of 320° and later gave a course of 330°. According to the helmsman, he was given a course of 325° which he acknowledged to the pilot.

The vessel proceeded through the patchy fog at a speed of two to three knots.

There was a radar device on the bridge which was accessible to both the master and the pilot. The pilot admitted that he did not direct the master to plot the course or position of the ship or to provide him with any particular information, but there is a conflict in the testimony as to just what did occur concerning the radar. The master testified that he looked casually at the radar on more than one occasion, but that only once did he stay long enough to get any useful information. The pilot testified that on two or three occasions he said to the master, "How does she look," to which the master replied, "She looks fine." The pilot said that he himself looked at the radar on two or three occasions, only to observe that it was working properly, but that he did not stay long enough to observe any detail.

The pilot testified that he intended to take the ship close to the western end of the entrance to the harbor and to then change the course to go through the opening. He admitted that he knew that if he had started from the entrance buoy one mile south of the middle of the entrance of the breakwater and had then steered a course of 360 degrees, the ship would have travelled through the middle of the entrance and that there would have been more margin for error in such a course. It was his choice to take the ship upon a course that would bring it close to the western end of the entrance.[1]

1. Captain Ougland testified as follows:
"Q. When you come in at an angle either way, you cut down the margin of error space that is present? A. That is correct.
"Q. That is correct, is it not? A. Right.
"Q. Now, in a heavy fog, then, you made a deliberate decision to not go in

directly but to come in on an angle, is that correct? A. I come in purposely on that course favoring the west side because that is the only horn that you can hear from the ship up on the bridge.
    *    *    *    *    *
"Q. At the time you made the course change to 330, you said you deliberately intended not to go straight in. You in-

During the period when the pilot had the conn of the ship there were varying conditions of visibility. He knew that the fog was thick at the entrance to the harbor, for he had just passed through that area while in the pilot boat on the way to the Dona Aurora. During none of the time, with the exception of the first two or three minutes, did the pilot have radio contact with the shore radar station. At no time did he attempt to contact the shore radar station through the apparatus on the pilot boat, and at no time did the shore station attempt to contact the ship through the apparatus on the pilot boat although it is undisputed that the shore station was in contact with the pilot boat.

As the ship was proceeding through the patchy fog the pilot observed a heavy fog bank ahead and put the engines on "dead slow ahead." About a minute and a half later he stopped both engines. One minute later he ordered hard right rudder. Shortly thereafter he saw the "lighthouse coming out of the fog" and he threw the telegraph "full astern." However, the ship hit the rocks of the breakwater below the water line.

The district court found that the pilot was guilty of "negligence of a most palpable kind, proximately causing and contributing to the grounding." He found that—

"(a) He failed to determine the position of the Dona Aurora at the time he assumed the conn of the vessel or at any time until the vessel grounded on the Long Beach breakwater.

"(b) He set the vessel on a collision course.

"(c) He chose the most dangerous of alternative courses to the breakwater entrance under conditions of minimal visibility and knowing he was without contact with the Long Beach shore-based radar.

"(d) He failed to use alternate available means of contacting the Long Beach shore-based radar by radio relay through the Long Beach Pilot Boat.

"(e) He failed to stop the vessel when he lost contact with the Long Beach shore-based radar station.

"(f) He failed to make the vessel's master and crew aware of his lack of communication with the Long Beach shore-based radar station, while he gave the impression he had such contact.

"(g) He failed to employ the ship's radar properly in the navigation of the vessel.

"(h) He relied upon navigating by sound, heading and directing the vessel towards the west side of the breakwater entrance so he could hear the fog horn on the bridge and using sounds of the fog signal on the west side of the breakwater entrance to determine the safety of his course, knowing that sounds in fog often 'play tricks' and that their origin may not be where it seems to be."

■ The scope of this court's power to review is set out in McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20. The Supreme Court there said:

"In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure. 28 U.S.C.A. * * * A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been com-

---

tended to go on this course that would bring you close to the west side, is that right? A. That is correct, up to a point where we squared off. In other words,

I am bringing her to the westward and depending on getting information, which I didn't get, from the captain, and I proceeded."

mitted * * *.'" [Citations omitted.]

We hold that the findings of the district court were not clearly erroneous.

In addition to denying negligence upon their part, appellants contend that the cause of the accident was the negligence of the appellee in that (1) the master of the ship saw on the radar screen that the ship was heading toward the breakwater and did not so advise the pilot; (2) that the ship failed to maintain a proper lookout; and (3) that the lookout failed to advise the bridge promptly of what was heard and seen.

At the time that the master took a "long look" at the radar screen, the ship was on a diagonal course and was closer to the eastern edge of the breakwater entrance than to the western edge. However, that is the course the pilot chose to take in order that the vessel would come close to the fog horn of the lighthouse. The master testified that he told the pilot the easterly edge of the entrance was "fast approaching" and the pilot replied, "Yes." "So I thought everything was all right." When the master was asked under what circumstances he would take the conn of the ship from the pilot, he testified as follows:

"Q. Can you think of any other circumstances arising where you would take the conn of the ship away from him? A. When the ship is standing in danger, I will take the ship.

"Q. You knew your ship was standing in danger when you looked in the radar, didn't you? A. No."

While the testimony of the master as to where the ship was when he made the above observation of the radar or how long this occurred before the grounding of the ship is not entirely satisfactory, we cannot say that it requires a finding of negligence upon his part.

Appellants also contend that the ship failed to maintain a proper lookout, and that this was a proximate cause of the grounding. The evidence shows that it was approximately 200 feet from the bridge of the ship to the bow and that the bridge was approximately twenty feet higher than the bow. Appellant contends that from a position on the bow a lookout should have seen the lighthouse before it was seen by the pilot, and that if it had been seen and reported to the bridge the pilot would have had an opportunity to change the course of the vessel and miss the edge of the breakwater. Appellants also complain of the fact that the lookout did not report to the bridge the fact that "lots" of fog horn signals were heard.[2]

The pilot, however, being familiar with local conditions, testified that he heard the fog horn blowing on the westerly side of the entrance to the harbor, and the small fog horn blowing upon the easterly side thereof. He also testified that at the time he entered the fog bank he heard the fog signal on the lighthouse and that at that time "it appeared to be on the port bow, well on the port bow."[3] It must be remembered that this is a grounding case, not a collision case, and that the vital signals for the pilot to be aware of were those signals coming from

2. Chief Officer Zablan, a resident of the Philippines, testified as follows:
"Q. Can you describe the fog signals that you heard? A. We heard some ships around, and I figure the ships are inside the harbor.
"Q. Did you hear the fog horn on the ends of the breakwater? A. Fog horn? I cannot distinguish the fog horn.
"Q. In other words, you heard fog-signals, but you couldn't determine whether they were ships or the fog

signals on the end of the breakwater, is that correct? A. That's right."

3. That the pilot was in error as to the location of this signal is explained by the testimony of Captain Jacobsen that under fog conditions sounds often "play tricks". He explained that in fog often a sound from a fog horn would appear to come from one direction while actually it came from a different direction.

the lighthouses on each end of the entrance to the harbor. It appears from the pilot's own testimony that he was aware of and was able to distinguish between the signals of the two lighthouses, and therefore the failure of the lookout to report "lots" of fog horn signals which he was unable to definitely locate or identify would in no way be material.

It was shown by appellees that the chief officer was properly positioned in the extreme forward end of the vessel, that some other seamen were also in that location, and that some of these men were also acting as lookouts. The chief officer testified that he reported the lighthouse as soon as it could be seen from his position on the extreme forward forecastle and that he was maintaining an attentive forward lookout at that time. The chief officer further testified that it was less than a half minute from the time he reported seeing the lighthouse until the ship hit the breakwater. He further testified that at that time there was a uniform fog, that he was unable to state the exact distance of the visibility,—"it was too foggy."

In a written report made by the pilot to the United States Coast Guard a day or two after the accident, he made no complaint of any failure of a proper lookout. In fact, he stated that "[d]uring all of the time in question the ship maintained a lookout on the bow and continuously sounded fog signals."

The district judge, after a consideration of the contentions made by the appellants, made the following finding:

"17. There was no fault upon the part of Dona Aurora or the agents, servants or employees of libellant which caused or contributed to the grounding."

From an examination of the record, we are unable to say that such a finding was clearly erroneous. We have examined other contentions of appellants and find no merit in them.

The judgment is affirmed.